[Cite as *In re J.G.*, 2022-Ohio-4072.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In re:  J.G.,                                                            :                    No. 22AP-10
                                                                                                   (C.P.C. No. 19JU-2735)
[J.R.G.,                                                            :
                                                                                           (ACCELERATED CALENDAR)
                              Appellant].                        :


D E C I S I O N

Rendered on November 15, 2022


**On brief:** *Sharon K. Carney*, for appellee Franklin County
Children Services.

**On brief:** *Yeura Venters*, Public Defender, and *Robert D.
Essex*, for appellant.


APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch.


KLATT, J.

{¶ 1}  Appellant, J.R.G. ("mother"), appeals a judgment of the Franklin County
Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that granted
permanent custody of her son, J.G., to Franklin County Children Services ("FCCS").  For
the following reasons, we affirm that judgment.

{¶ 2}  Mother gave birth to J.G. on October 23, 2018.  Approximately two months
later, on or about December 19, 2018, mother arrived with J.G. at the Van Buren Center,
the homeless shelter where she and J.G. had been living, after curfew.  Even though it was
December, J.G. was only wearing a onesie.  Mother told the shelter staff that J.G. had slept
all day because he had been drinking water from the shelter.  While speaking with the
shelter staff, mother handled J.G. roughly, flipping him around and placing him on the
ground, only to pick him up again.  Emergency medical services were sought for J.G., who

was transported to Nationwide Children's Hospital for an evaluation. Mother was transported to Netcare Access, and she was then hospitalized to receive psychiatric treatment. Mother later told others that she believed J.G.'s father or the FBI had kidnapped J.G., and she claimed the Van Buren Center staff and the police were "lying about her." (Compl. at 2.)

{¶ 3} Due to the incident at the Van Buren Center, on December 19, 2018, FCCS filed a complaint asserting that J.G. was a dependent child pursuant to R.C. 2151.04(C). In addition, FCCS claimed in the complaint that J.G. was a dependent child pursuant to R.C. 2151.04(D)(1) and (2). To support this ground for dependency, FCCS alleged that mother had previously lost custody of each of J.G.'s three siblings because of her failure to remedy her mental health issues, drug dependency, and lack of stable housing. The trial court had found each of J.G.'s siblings dependent children. FCCS received permanent custody of two of the children, and a relative received legal custody of the third child.

{¶ 4} Upon the filing of the complaint, a magistrate immediately granted FCCS an emergency care order to allow FCCS to provide care for J.G. The next day, December 20, 2018, the magistrate granted FCCS a temporary order of custody of J.G.

{¶ 5} The trial court dismissed the December 19, 2018 complaint because a dispositional hearing could not occur within 90 days of the filing of the complaint as required by R.C. 2151.35(B)(1). FCCS refiled the complaint on March 6, 2019. On March 7, 2019, a magistrate again granted FCCS a temporary order of custody of J.G.

{¶ 6} On May 7, 2019, a magistrate held a combined adjudicatory and dispositional hearing regarding J.G. Mother did not contest any of the allegations in the complaint. Consequently, in her decision, the magistrate found that J.G. was a dependent child as defined in R.C. 2151.04(C) and 2151.04(D)(1) and (2). The magistrate also granted FCCS temporary custody of J.G., and she approved and adopted the case plan. In a judgment dated June 10, 2019, the trial court adopted the magistrate's decision.

{¶ 7} Among other requirements, the case plan provided that mother had to: (1) complete a psychological and/or mental health evaluation and follow through with all recommendations, (2) obtain mental stability, (3) follow all recommendations for her medical health treatment and medication management, (4) obtain sobriety, (5) complete random urine screens, (6) complete a substance abuse assessment and follow through with

all recommendations, (7) obtain and maintain stable housing, (8) obtain legal income and/or employment, and (9) complete parenting classes and/or services and follow all recommendations.

{¶ 8} On October 24, 2019, FCCS moved to extend its temporary custody of J.G. for six months. FCCS reported to the trial court that mother had completed both parenting classes and a mental health assessment. She had submitted to 15 out of 26 random urine screens, with three testing positive for marijuana and two testing positive for alcohol. Additionally, mother had obtained employment at a temporary employment agency. The trial court granted FCCS' motion.

{¶ 9} On April 23, 2020, FCCS moved for permanent custody of J.G. FCCS explained that mother's mental health assessment had resulted in a diagnosis of depression and schizophrenia, with the recommendation that mother take her prescribed medication, and abstain from alcohol and other drugs to avoid interactions with the prescribed medication. Mother, however, did not consistently take her prescribed medication. Also, mother had not undertaken a substance abuse assessment, nor was she completing random urine screens. Of 42 random urine screens, mother had completed only 18.

{¶ 10} The trial court held a hearing on FCCS' motion for permanent custody on November 16, 2021. At the hearing, testimony focused on the extent to which mother fulfilled the case plan components, as well as J.G.'s wellbeing and his interactions and relationships with his mother and his foster family.

{¶ 11} Kelli Steele, the FCCS ongoing caseworker assigned to the family, testified that she had reviewed the case plan with mother and explained to mother what the case plan required of her. According to Steele, mother understood her obligations under the case plan.

{¶ 12} Steele stated that mother completed a psychological assessment, and she receives ongoing mental health treatment at Southeast Healthcare. Mother admitted that she has been diagnosed with depression, bipolar disorder, and schizophrenia. As part of mother's mental health treatment, mother was prescribed a monthly injection of Abilify. Steele testified that mother neither consistently attends her mental health appointments nor regularly obtains her monthly medication. Mother acknowledged that she has missed injections of Abilify.

{¶ 13} In addition to a psychological assessment, the case plan required mother to undergo a substance abuse assessment. The case plan mandated a substance abuse assessment because mother had admitted to prior alcohol, marijuana, and cocaine use. Mother finally submitted to a substance abuse assessment in June 2020—over one year and six months after she lost custody of J.G. Linda Granville, an assessment counselor at Columbus Public Health, conducted the substance abuse assessment and diagnosed mother with severe alcohol-use disorder, severe cocaine-use disorder, and moderate marijuana-use disorder. With regard to alcohol use, Granville's report states:

> [Mother] reports she first drank at age 15 and by her mid 20's drank daily, sometimes to the point of passing out.[1] [Mother] reports in her 20's she drank a pint of liquor every day. [Mother] reports in her mid 30's she slowed her drinking some. [Mother] describes her drinking patterns as times where she drank a lot but times where she did not drink as much[ ]. [Mother] reports prior to [Covid-19,] she was clean and sober for about a year[,] then [she] got depressed because she could not see her son. [Mother] reports she started to drink 4 glasses of wine or a pint of Smirnoff "fruity drink" every day. [Mother] reports, "I like beer when I do a line" of cocaine. [Mother] denies withdrawal but admits to having a "high tolerance."

(FCCS Ex. 8 at 5.) With regard to marijuana use, Granville's report states:

> [Mother] reports she first smoked marijuana at age 12 and by age 15 smoked daily and this pattern did not stop until [mother's] case with FCCS was opened almost 2 [years] ago. [Mother] reports she was clean for about a year until [Covid-19,] then she relapsed using daily but has tried to slow down during the last 2 weeks. [Mother] reports developing a tolerance and reports withdrawal.

*Id.* Finally, with regard to cocaine use, Granville's report states:

> [Mother] reports she first used cocaine at age 15 and by age 18 she was binging 2x/month. [Mother] reports in her 20's she binged almost daily. [Mother] reports her binges last about 3 days, then she stops for a day or so and starts again. [Mother] reports in her mid 30's she slowed her use to single use episodes 3-4x/month. [Mother] reports in the last 30 days she has used 4-8 times, "a 20" each time and states "I want more after I use."

---

[1] At the time of the assessment, mother was 37 years old.

*Id.*

{¶ 14} As a result of the substance abuse assessment, Granville recommend dual diagnosis treatment—for both mother's mental health and substance abuse issues—at Southeast Healthcare. Mother began substance abuse treatment at Southeast Healthcare, but she was discharged from the program in February 2021 when she stopped attending. Mother stated she stopped attending because she "felt like [the program] wasn't enough for [her]." (Nov. 16, 2021 Tr. at 25.)

{¶ 15} Mother completed a second substance abuse assessment in October 2021. She began a second substance abuse treatment program at Southeast Healthcare in November 2021, but she had only attended one treatment session as of the date of the permanent custody hearing.

{¶ 16} Mother claimed that she was sober at the hearing, and that she had been sober since August 2021. Through most of the case mother had not consistently completed urine screens, but she had completed all random screens in August through November 2021. The initial screens were decreasingly positive for marijuana, and the later screens were negative for all substances. However, at the hearing, mother admitted that, previously, her longest period of sobriety has only lasted approximately six months. Mother had also been in substance abuse treatment three times prior to the failed attempt in early 2021.

{¶ 17} In addition to the psychological and substance abuse assessments, the case plan required mother to obtain stable housing and employment, and complete parenting classes. At the hearing, mother testified that she began employment at a Gap Inc. warehouse in August 2021 and at a Dollar Tree store in June or July 2021. According to mother, she stays employed and has worked a variety of different jobs. Mother has an apartment, but she intends to move due to the poor condition of her apartment complex. Daniel Miller, J.G.'s guardian ad litem, stated that the apartment complex "has been pretty much labeled a nuisance by the city." *Id.* at 153. Mother also testified that she completed parenting classes.

{¶ 18} Apart from the case plan, the testimony at the hearing focused on J.G. When J.G. first entered FCCS' custody, mother regularly attended one-hour visits with J.G. at the agency. Due to mother's regular attendance, FCCS increased the visit duration to two

hours. Mother, however, asked FCCS to return to one-hour visits. Mother then began to miss visits and show up late, so FCCS asked her to call an hour before the start of each visit to confirm her attendance. When mother's attendance problems persisted, FCCS began requiring mother to appear for visits an hour ahead of the visit start time. Mother blamed work and transportation issues for her tardiness and failure to appear.

{¶ 19} J.G. cries during visits, which frustrates mother. When J.G. was two years old, she posted a photograph of a pouting J.G. to her Facebook page and captioned it "[m]y cry baby." (FCCS Ex. 5.)

{¶ 20} Both Steele, the FCCS caseworker, and Miller, the guardian ad litem, agreed that J.G. acts differently when with his mother than when he is in his foster home. Miller testified that J.G. is quiet and subdued with mother, but talkative and energetic in the presence of his foster family. Steele stated J.G. is "a little more tense" when visiting his mother. (Tr. at 120.) According to Steele, J.G. previously did not want to interact with mother, but recently has become more willing to talk and interact. Both Steele and Miller testified that J.G. is bonded with his foster parents, who have raised J.G. since he was removed from his mother's custody, and his foster siblings. J.G. calls his foster mother "mom" or "mommy." The foster parents want to adopt J.G.

{¶ 21} According to Miller, at three years old, J.G. did not have the maturity to understand the nature of the permanent custody proceedings. Consequently, J.G. could not express any wish regarding the outcome of the proceedings. Miller recommended that that the trial court grant FCCS permanent custody of J.G. Although Miller commended mother on her progress toward completing the requirements of her case plan, he expressed concern that mother could not handle parenting both J.G. and the baby mother was due to give birth to in January 2022.

{¶ 22} On December 17, 2021, the trial court entered judgment granting FCCS permanent custody of J.G. The trial court found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1), J.G. had been in FCCS' custody for 12 months out of a consecutive 22-month period and awarding FCCS permanent custody was in J.G.'s best interest.

{¶ 23} Mother now appeals the December 17, 2021 judgment, and she assigns the following error:

> The trial court committed reversible error by terminating the appellant-mother's parental rights when the decision was against the manifest weight of the evidence.

{¶ 24} An appellate court will not reverse a juvenile court's determination in a permanent custody case unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). Thus, in reviewing a judgment under the manifest weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *Id.* at ¶ 20.

{¶ 25} Additionally, in conducting a manifest weight review, an appellate court must make every reasonable presumption in favor of the trial court's judgment and findings of fact. *Id.* at ¶ 21. If the evidence is susceptible to more than one construction, an appellate court must interpret it in the manner most consistent with the judgment. *Id.* Moreover, " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' " *In re H.H.*, 10th Dist. No. 19AP-158, 2019-Ohio-4953, ¶ 49, quoting *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34.

{¶ 26} Mother challenges the trial court's decision to grant FCCS permanent custody of J.G. under R.C. 2151.414(B)(1). Under that section, a juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency * * * and that any of the following apply:"

(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 27} Once the juvenile court decides that one of the circumstances in R.C. 2151.414(B)(1) applies, the court turns to R.C. 2151.414(D) to decide if a grant of permanent custody is in the child's best interest. Pursuant to R.C. 2151.414(D)(1), in determining a child's best interest, the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 28} In the case at bar, mother did not contest that J.G. had been in FCCS' custody for 12 or more months of a consecutive 22-month period when FCCS moved for permanent custody. Accordingly, because the condition set forth in R.C. 2151.414(B)(1)(d) was established, the trial court was statutorily authorized to grant FCCS permanent custody of J.G. if clear and convincing evidence existed that it was in J.G.'s best interest to do so. *See In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18 (holding that, before granting a motion for permanent custody, a juvenile court must find by clear and convincing evidence that (1) one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies, and (2) a grant of permanent custody is in the child's best interest).

{¶ 29} Under the first best-interest factor, the trial court must consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). Here, the trial court's analysis included the finding, based on Steele's and Miller's testimony, that J.G. is strongly bonded to his foster family. J.G.'s foster family is the only family J.G. has ever known, and they are willing to adopt him. The trial court also recounted the testimony that J.G. is talkative, energetic, and active in his foster home, but tearful, quiet, and reserved during supervised visits with his mother.

{¶ 30} Mother first complains that the trial court failed to take into consideration the natural reserve J.G. would have for someone he spends only one hour a week with, and she blames FCCS for not allowing her longer visits to develop a deeper bond with J.G. We acknowledge that building a bond with a baby or toddler within the parameters of supervised visitation could prove difficult. However, mother ignores that FCCS wanted to extend her visiting time with J.G., but she refused. Mother then began missing visits and appearing late. We thus are disinclined to hold FCCS responsible for J.G.'s reticence with mother. Moreover, regardless of the reasons for J.G.'s behavior with mother, the trial court had to take that behavior into account when considering J.G.'s interaction with mother.

{¶ 31} Mother next faults the trial court for not referencing the alleged recent improvement in her relationship with J.G. To assert that her relationship with J.G. has improved, mother relies upon Steele's testimony that "[r]ecently, [J.G. has] been more willing to talk and interact" with mother during their visits. (Tr. at 120.) Mother infers from J.G.'s willingness to talk and interact with her that he now feels a closer relationship to her. However, on cross-examination, Steele explained, "what I'm saying is, [J.G. is] able to vocalize, since he's able to talk * * * he's able to vocalize more what he wants to do * * * during visits. When he couldn't talk, * * * there was no real interaction. But now that he is talking and mom is understanding like what his interest is, it's a little bit easier to interact with [him] during visits." (Tr. at 132-33.) Therefore, Steele did not testify to an improved relationship between J.G. and mother, but rather easier interaction between mother and J.G. now that J.G. has matured enough to talk to mother. The trial court, consequently, did not err in not including its consideration the alleged improved relationship between mother and J.G.

{¶ 32} Under the second best-interest factor, the trial court must consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). Here, the trial court did not consider J.G.'s wishes given the guardian ad litem's testimony that, at three years old, J.G. was not capable of expressing those wishes. Mother does not contend the trial court erred in this determination.

{¶ 33} Under the third best-interest factor, the trial court must consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(D)(1)(c). Here, the trial court considered that J.G. had been in FCCS' custody for over 12 months of a consecutive 22-month period. Mother contends that the trial court erred in not expanding its review to examine the reasons behind J.G.'s custodial history. However, in an analysis under R.C. 2151.414(D)(1)(c), a trial court has no obligation to consider additional facts beyond the 12-out-of-22 circumstance. *In re N.H.*, 10th Dist. No. 20AP-158, 2021-Ohio-2080, ¶ 48; *In re J.H.*, 10th Dist. No. 19AP-517, 2021-Ohio-807, ¶ 45. The trial court, therefore, did not err in its analysis of the third best-interest factor.

{¶ 34} Under the fourth best-interest factor, the trial court must consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). Mother argues that the trial court erred in not considering her as a potential legally secure permanent placement for J.G. While the trial court analyzed whether mother could provide J.G. with a permanent home, it conducted that analysis in its consideration of the fifth best-interest factor instead of the fourth best-interest factor. Nevertheless, the substance of the trial court's analysis applies to the fourth best-interest factor, so we will address it now.

{¶ 35} Mother contends that the trial court erred in concluding that she could not assume permanent custody of J.G. In making that determination, the trial court reviewed the evidence regarding mother's substance abuse, including testimony that mother was diagnosed with severe alcohol-use disorder, severe cocaine-use disorder, and moderate marijuana-use disorder. Mother had more than two years to obtain substance abuse treatment and demonstrate she could maintain sobriety. However, mother quit one substance abuse treatment program, and she did not start a second until the month of the hearing. Mother did not begin to consistently undergo random urine screens until three months prior to the permanent custody hearing. Previously, mother has abstained from alcohol and drugs for a period, only to relapse again. The evidence, therefore, did not establish that mother has obtained sobriety.

{¶ 36} Second, the trial court considered mother's significant mental health diagnoses, including depression, bipolar disorder, and schizophrenia. Mother acknowledges her mental health issues. Mother, however, does not consistently attend the appointments to receive the mood-stabilizing medication necessary to treat her mental health conditions.

{¶ 37} Finally, the trial court looked to mother's housing. The guardian ad litem testified that mother's individual apartment is appropriate, but the apartment complex is not safe for children. According to the guardian ad litem, the apartment complex "has been pretty much labeled a nuisance by the city." (Tr. at 153.)

{¶ 38} In reviewing this evidence, we also recognize that the record contains evidence that mother completed some of the goals in the case plan. At the time of the

permanent custody hearing, she had obtained employment and attended parenting classes. However, a finding that a parent has satisfied case plan goals does not necessarily equate to a finding that the parent has the ability to assume custody of a child. *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 31. That is the problem here. While mother has complied with some aspects of the case plan, mother has not demonstrated lasting sobriety, an ability to consistently manage her mental health, or that she has obtained housing suitable for a child. Thus, the manifest weight of the evidence demonstrates that mother is still uncapable of giving J.G. a legally secure permanent placement.

{¶ 39} Under the fifth best-interest factor, the trial court must consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(e). In applying the fifth best-interest factor, the trial court erred. It found that "factors pursuant to R.C. 2151.414(E) (7-11) apply because [m]other has failed continuously and repeatedly to substantially remedy the conditions that caused [J.G.'s] removal." (Dec. 17, 2021 Decision & Jgmt. Entry at 8.) Whether a parent has "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home" is a factor for consideration under R.C. 2151.414(E)(1), not R.C. 2151.414(E)(7) through (11). Nevertheless, the trial court's ensuing analysis is relevant to the question of whether mother could assume permanent custody of J.G., which, as we explained above, fits within the consideration of the fourth best-interest factor. Therefore, the trial court's error is harmless. *See Foy v. State of Ohio Atty. Gen.*, 10th Dist. No. 21AP-420, 2022-Ohio-62, ¶ 15 (" '[a]bsent any indication of material prejudice, error is harmless and cannot serve as a basis for reversal' ").

{¶ 40} After weighing all relevant factors, the trial court concluded that a grant of permanent custody to FCCS was in J.G.'s best interest. We find that the manifest weight of the evidence supports that conclusion, and we overrule mother's assignment of error.

{¶ 41} For the foregoing reasons, we overrule mother's assignment of error, and we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

SADLER and MENTEL, JJ., concur.

———————