[Cite as *In re D.R.*, 2023-Ohio-539.]

IN THE COURT OF APPEALS OF OHIO

TENET APPELLATE DISTRICT

In re:                                        :
                                                              No. 21AP-697
[D.R.,                                        :           (C.P.C. No. 18JU-2667)

T.R., Father,                              :           (REGULAR CALENDAR)

        Appellant].                       :

_____

D E C I S I O N

Rendered on February 23, 2023

_____

**On brief**: *Yeura Venters*, Public Defender, and *Leon J. Sinoff*, for appellant father. **Argued**: *Leon J. Sinoff*.

**On brief**: *Robert J. McClaren*, for appellee Franklin County Children Services.

**On brief**: *William T. Cramer*, for appellee F.B.

_____

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1} Appellant, T.R. ("father"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion of appellee, Franklin County Children Services ("FCCS" or "agency"), for permanent custody of father's child, D.R. For the reasons that follow, we reverse.

I. **Facts and Procedural History**

{¶ 2} D.R. was born April 23, 2012. D.R.'s mother, F.B., and father were married at the time of D.R.'s birth but subsequently divorced. D.R. lived primarily with mother following the divorce and had visitation with father on weekends. On August 2, 2018, FCCS filed a complaint alleging D.R. was an abused, neglected, and dependent child. On

October 31, 2018, FCCS dismissed and refiled the complaint alleging D.R. was an abused, neglected, and dependent child.

{¶ 3}    FCCS initially received a referral regarding D.R. on July 10, 2018, following a domestic violence incident in D.R.'s home.  A police report from the incident indicated that D.W., mother's live-in boyfriend and the father of mother's son J.W., choked mother and threw D.R. to the floor causing D.R. to hit a coffee table. D.R. had visible bruising on his body following the incident. FCCS also discovered that D.R. had numerous absences from school and was dirty when present at school.  On October 31, 2018, the court granted FCCS a temporary order of protective supervision over D.R. and J.W. and ordered that D.W. have no contact with D.R.

{¶ 4}    On November 16, 2018, following a second domestic violence incident involving D.W., D.R., and mother, FCCS removed D.R. and J.W. from mother's care pursuant to an emergency care order. FCCS initially placed D.R. and J.W. in the home of J.W.'s paternal grandmother, but removed the children a few days later at the grandmother's request and placed the children in a foster home in Coshocton, Ohio. Mother gave birth to another child, A.W., on December 1, 2018. The trial court granted FCCS temporary custody of A.W. after his birth, and the agency eventually placed A.W. in the same foster home as D.R. and J.W.

{¶ 5}    On February 4, 2019, the trial court adjudicated D.R. abused, dismissed the remaining causes of action in the complaint, ordered temporary custody of D.R. to FCCS, and adopted a case plan.  The case plan required father to complete random drug screens, complete an alcohol and other drug assessment and comply with any recommendations, comply with recommendations for his mental health, attain his own safe and stable housing, meet with the FCCS caseworker monthly, and meet D.R.'s basic needs. The case plan also contained requirements for mother.

{¶ 6}    On August 25, 2019, the trial court granted FCCS an extension of the temporary custody order.  On February 19, 2020, the trial court granted FCCS a second and final extension of the temporary custody order.  FCCS filed a motion for permanent custody on July 1, 2020.

{¶ 7}    D.R.'s guardian ad litem ("GAL") reported that D.R. exhibited serious behavior problems and low academic performance at school while in mother's care. After

FCCS placed D.R. in the foster home, D.R.'s academic performance gradually improved but D.R. continued to exhibit behavioral concerns. Following troubling incidents in summer 2020, the foster family enrolled D.R. in counseling and implemented a safety plan for D.R. in their home.

{¶ 8} Mother initially complied with several aspects of her case plan and had an unsupervised weekend visit with the children in March 2019. However, mother permitted D.W. to be in the home with D.R. in violation of the no contact order during the March 2019 visit, and FCCS terminated mother's weekend visits. Mother informed the agency that the allegations of domestic violence against D.W. were false and that she would not keep the children away from D.W. When FCCS filed the motion for permanent custody, mother informed the court she would not contest the motion.

{¶ 9} Father was homeless throughout the first year and one-half of the case and did not have contact with D.R., the GAL, or the agency during that time. In fall 2020, father began to have phone contact with D.R. and participate in case-related services. Father lived with his grandparents for a few months in 2020 and lived in an extended stay hotel for the following year. Father continually informed the GAL throughout 2020 and 2021 that he expected to receive housing through an organization called Maryhaven Outreach "within a few weeks." (Nov. 19, 2020 GAL report at 13.)

{¶ 10} On May 24, 2021, a trial on the agency's motion for permanent custody commenced before Judge Terri Jamison. The agency presented its case-in-chief and rested. Father testified on his own behalf and the court continued the trial before FCCS cross-examined father. The trial resumed before Judge Jamison on June 4, 2021, but the proceeding stopped when father informed the court he was sick. The trial again resumed before Judge Jamison on June 28, 2021, and father stated that he expected to receive housing through Maryhaven by July 1, 2021. Following father's statement, the court had a discussion with counsel off record and then sustained father's motion for a continuance "to allow for father to complete his case plan objective of housing." (June 28, 2021 Tr. at 10.)

{¶ 11} On October 25, 2021, the trial resumed before Judge Dana Preisse.[1] FCCS presented its case-in-chief, and father and mother both testified on their own behalf at trial.

---

[1] Judge Terri Jamison became a judge of the Tenth District Court of Appeals of Ohio on July 1, 2021.

{¶ 12} Father informed the court that he moved into a one-bedroom apartment in either late August or early September 2021, which had been leased by father's relative who passed away. Father stated that the landlord would permit him to sign a lease for the apartment on November 1, 2021, if father could pay the first month's rent and a deposit totaling $1,000 by that date. Although father only had $300, he hoped to receive assistance from either a family member or Maryhaven to cover the remaining portion of the payment.

{¶ 13} Father informed the court that, if D.R. lived with him, D.R. would sleep in the bedroom of the apartment and father and his fiancée would sleep in the living room. Father did not have custody of his other child, six-year-old L., but would have overnight visits with her. Father stated that during L.'s visits, D.R. would sleep in the bedroom and L. would sleep in the living room with father and his fiancée.

{¶ 14} Father suffered from post-traumatic stress disorder, bipolar disorder, and a seizure disorder. Father completed a mental health assessment in April 2021 which recommended that he complete "[s]ix months of [counseling sessions] at least once a month." (Oct. 25, 2021 Tr. at 38-39.) Father did not attend counseling sessions for six consecutive months as recommended. Father was supposed to call in "on a daily basis" to see if he needed to report for a drug screen, but he did not call in regularly. (Oct. 25, 2021 Tr. at 61-62.) Father completed a total of five drug screens throughout the case; four were positive for marijuana. Father presented the medical marijuana card he obtained in June 2021 as an exhibit at trial.

{¶ 15} Although father was scheduled to have weekly in-person visits with D.R., he saw D.R. only four or five times in-person throughout the case. Father had a virtual visit with D.R. in March 2021 and had in-person visits with D.R. in April, May, and June 2021.

{¶ 16} The FCCS caseworker testified that father was not compliant with the stable housing or mental health components of his case plan, and father was only minimally compliant with the random drug screen component of his case plan. The caseworker stated that D.R. was bonded with his foster parents and siblings in the foster home, and that D.R. was not bonded with father.

{¶ 17} The GAL recommended granting the agency's motion for permanent custody. The GAL testified that D.R. had expressed in "clear" and "direct" terms consistently throughout the year before trial that he wanted to "remain with the foster family." (Oct. 25,

2021 Tr. at 113.) The GAL stated that D.R. had never expressed a desire to live with father and that D.R. did not appear strongly connected to father. Evidence presented at trial demonstrated that the foster home was interested in adopting D.R., J.W., and A.W.

{¶ 18} Toward the end of trial, mother testified on her own behalf. Mother testified she did not want father to have custody of D.R. and that she believed father lived with his girlfriend and a man named I.K. Mother stated that both father and I.K. had criminal records and she presented information from their respective criminal cases as exhibits at trial. The exhibits demonstrated that father had convictions for burglary and attempted felonious assault, and that I.K. had convictions for gross sexual imposition and failure to verify current address.

{¶ 19} On November 29, 2021, Judge Preisse issued a decision and judgment entry granting FCCS's motion for permanent custody and divesting father of his parental rights.

## II. Assignments of Error

{¶ 20} Father appeals the judgment of the trial court, presenting the following assignments of error for our review:

> [I.] By Terminating [Father's] Parental Rights Based On a Factfinding Process Which Resulted in Egregiously Errant Factual Determinations About [Father's] Criminal Record, Including Falsely Identifying Him as a Sex Criminal and Kidnapper, The Juvenile Court Failed to Assure Reasonable Factual Certainty for its Findings, and Denied [Father] His Constitutional Rights to Due Process of Law and His Fundamental Right to Parent His Child.
>
> [II.] The Juvenile Court's Judgment Terminating [Father's] Parental Rights Was Against the Manifest Weight of the Evidence.
>
> [III.] The Juvenile Court Violated [Father's] Constitutional Rights to Due Process of Law, and to Court Processes that Conform With Article IV, Section 5 of the Ohio Constitution When a Successor Judge Disregarded the Prior Trial Proceedings, Neither Reincorporating Them Nor Granting a New Trial, and Instead Restarted Trial Anew as if the Prior Proceedings Had Never Happened.

### III. First and Second Assignments of Error – Permanent Custody Decision

{¶ 21} Father's first assignment of error asserts the trial court erred by granting FCCS's motion for permanent custody based on an erroneous factual determination. Father's second assignment of error asserts the trial court's judgment terminating his parental rights was against the manifest weight of the evidence. As father's first and second assignments of error are intertwined, we address them jointly.

{¶ 22} Parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). *Accord In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (stating that the "right to raise one's children is an 'essential' and 'basic civil right' "). However, a parent's fundamental right to raise their child is not absolute. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 11; *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8. A parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Thus, in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child. *E.G.* at ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000). This permanent termination of parental rights has been described as " ' "the family law equivalent of the death penalty in a criminal case." ' " *D.A.* at ¶ 10, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). Therefore, parents must be afforded every procedural and substantive protection the law allows. *Id.*

{¶ 23} R.C. 2151.414 governs the termination of parental rights in Ohio. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence that: (1) it is in the best interest of the child to grant permanent custody of the child to the agency, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (e) applies. Clear and convincing evidence is that measure or degree of proof " 'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Clear and convincing evidence requires

more than a mere preponderance of evidence but does not require proof beyond a reasonable doubt as in criminal cases. *Id.*

{¶ 24} An appellate court will not reverse a trial court's determination on a permanent custody motion unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 8, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 270 (1978), syllabus. "In determining whether the trial court's ruling on the permanent custody motion is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case satisfied or failed to satisfy the burden of persuasion, i.e., whether clear and convincing evidence supports each element." *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 8. In conducting our review, we are guided by the presumption that the findings of the trial court are correct. *In re R.L.*, 10th Dist. No. 07AP-36, 2007-Ohio-3553, ¶ 8, citing *In re Brofford*, 83 Ohio App.3d 869 (10th Dist.1992).

{¶ 25} The trial court found that clear and convincing evidence established the condition described in R.C. 2151.414(B)(1)(d). R.C. 2151.414(B)(1)(d) describes the situation where the child "has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." Father concedes that D.R. was in the temporary custody of FCCS for more than 12 months out of a consecutive 22-month period.

{¶ 26} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the court must then determine whether a grant of permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). R.C. 2151.414(D)(1) provides that, in determining the best interest of the child, the court must consider all relevant factors, including but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child, (b) the wishes of the child, as expressed directly by the child or through the child's GAL, with due regard for the maturity of the child, (c) the custodial history of the child, including whether the child has

been in the temporary custody of one or more public children services agencies or private child-placing agencies for 12 or more months of a consecutive 22-month period, (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (e) whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶ 27} The trial court addressed the R.C. 2151.414(D)(1)(a) through (d) best interest factors and made the following findings: D.R. was strongly bonded to his foster family and siblings in the foster home; D.R. was not bonded to father; D.R. had clearly expressed his desire to remain with the foster family; D.R. had been in the temporary custody of FCCS for more than 12 months out of a consecutive 22-month period; and D.R. was in need of legally secure placement and such placement could not be achieved without granting permanent custody to the agency. The court then addressed the R.C. 2151.414(D)(1)(e) best interest factor and found that "R.C. 2151.414(E)(7-11) appl[ied]" to father. (Decision at 8.)

{¶ 28} In its analysis of the R.C. 2151.414(D)(1)(e) factor, the court addressed the factors identified in R.C. 2151.414(E)(1), (4), and (16). R.C. 2151.414(D)(1)(e), however, instructs the court to consider only whether any of the factors in R.C. 2151.414(E)(7) to (11) apply to the parents and child and does not incorporate the remaining factors contained in R.C. 2151.414(E). *See In re J.G.*, 10th Dist. No. 22AP-10, 2022-Ohio-4072, ¶ 39 (finding that the trial court erred by analyzing R.C. 2151.414(E)(1) under the 2151.414(D)(1)(e) best interest factor because "R.C. 2151.414(E)(1) [was] not R.C. 2151.414(E)(7) through (11)," but further finding the error harmless). The trial court properly found that R.C. 2151.414(E)(10) applied to father, as father abandoned D.R. by failing to maintain contact or visitation with D.R. for longer than 90 days. *See* R.C. 2151.414(E)(10) (instructing the court to consider whether the "parent has abandoned the child"); R.C. 2151.011(C) (stating that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days"). Father admitted he did not have contact with D.R. during the year and one-half when father was homeless.

{¶ 29} The court included the following in support of its decision granting permanent custody to FCCS: "The Court finds it relevant that Father has criminal convictions in Franklin County, Ohio for burglary, kidnapping, gross sexual imposition,

escape, and failure to register as a sex offender. He has a conviction in Union County for attempted felonious assault. *See*, Mother's Ex. 1-3." (Decision at 13.) The court also "[found] it relevant" that father lived with a man named I.K. who "ha[d] a criminal record (see, Mother's exhibits 4-8)." (Decision at 12-13.)

{¶ 30} Father asserts, and we agree, that there is no evidence in the record to support the court's statements that father had convictions for kidnapping, gross sexual imposition, escape, and failure to register as a sex offender, or that he lived with I.K. Mother testified at the October 25, 2021 trial that she "believe[d]" father lived with I.K., but mother admitted on cross-examination she had no personal knowledge to support her belief that I.K. lived with father. (Oct. 25, 2021 Tr. at 182.) When mother stated she had been "told by numerous people that [father and I.K. were] residing in the same household," the court sustained father's objection to the statement. (Oct. 25, 2021 Tr. at 193-94.)

{¶ 31} Mother presented copies of the court dockets from father's and I.K.'s respective criminal cases as exhibits at trial. Mother's exhibit 1 demonstrated that father was charged with kidnapping and aggravated burglary in Franklin County in 2009, and that the court entered a nolle prosequi as to the kidnapping charge when father pled guilty to burglary. Mother's exhibit 2 demonstrated that father was convicted of attempted felonious assault in Union County in 2012. Notably, the GAL reports submitted throughout the case also informed the court of father's two convictions. Mother's exhibits 3 through 6 demonstrated that I.K. pled guilty to two counts of gross sexual imposition involving a minor in 2006, one count of failure to verify current address in 2014, one count of attempted failure to verify current address in 2016, and one count of failure to verify current address in 2018. Mother's exhibits 7 and 8 demonstrated the state charged I.K. with one count of escape in 2019 and one count of failure to register as a sex offender in 2020.

{¶ 32} Following mother's testimony, the court called father back to the stand to inquire about this "important" issue. (Oct. 25, 2021 Tr. at 209.) The court asked father if I.K. lived with him, and father told the court he did not. However, father admitted that I.K. spent the night at his house "[a] couple times" in the last week and that father did not know whether I.K. had his own residence. (Oct. 25, 2021 Tr. at 210.) Father also testified that I.K. had been around L. when I.K. was at father's residence, but stated I.K. was never left alone with L.

{¶ 33} Father's first assignment of error asserts that clear and convincing evidence does not support the trial court's decision to grant the agency's motion for permanent custody, because the court's decision relied on factual mistakes regarding father's criminal convictions. Father's second assignment of error asserts the court's judgment is against the manifest weight of the evidence due to the factual errors regarding father's criminal convictions and because father had substantially complied with his case plan objectives by the October 25, 2021 trial. Mother and FCCS acknowledge that the trial court wrongly attributed the kidnapping, gross sexual imposition, escape, and failure to register as a sex offender convictions to father, but contend that the court's misstatements amount to harmless error.

{¶ 34} R.C. 2151.414(E)(7) instructs the trial court to consider whether the parent has been convicted of or pled guilty to certain offenses where the victim of the offense was the child, a sibling of the child, or another child in the parent's household. Gross sexual imposition is identified as a qualifying offense in R.C. 2151.414(E)(7)(d). The record demonstrates that the victim in I.K.'s 2006 gross sexual imposition case was a juvenile, but does not contain further information regarding the victim. *See In re R.W.H.*, 2d Dist. No. 28880, 2021-Ohio-4024, ¶ 68. While the trial court did not specifically find that R.C. 2151.414(E)(7) applied to father because of the gross sexual imposition conviction, the court generally found that R.C. 2151.414(E)(7) to (11) applied to father. *See In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 31, 32 (holding that while "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)" because "[c]onsideration is all the statute requires," the "best practice is for the juvenile court to specifically address each factor").

{¶ 35} Even if the trial court did not consider the erroneous criminal convictions under R.C. 2151.414(E)(7), the court expressly found the convictions "relevant" to its best interest analysis. (Decision at 13.) R.C. 2151.414(D)(1) "requires a weighing of all the relevant factors" and the statute does not given any one factor "greater weight than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 64, 56. *Accord In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 57 (stating that under the statutory best interest analysis "[n]o one element is given greater weight or heightened significance"). Thus, it is

apparent the court considered erroneous facts when weighing the factors relevant to D.R.'s best interests.

{¶ 36} Father contends the trial court's belief that he was a sex offender likely caused the court to assume he was unfit to raise his child. While we cannot assess with certainty the degree to which the incorrect findings influenced the court's ultimate decision, we share in father's concern regarding the negative impact the findings at issue may have had on the court's analysis. *See In re D.A.*, 6th Dist. No. L-11-1197, 2012-Ohio-1104, ¶ 44, citing *K.H.* at ¶ 52, 47 (recognizing that, while the "Ohio Supreme Court has not held that sex offender status alone constitutes a basis for restricting or terminating parental rights," a parent must demonstrate they are able to "protect [their] child from risks of sexual abuse"); *Santosky* at 759, quoting *Lassiter v. Dept. of Social Servs.*, 452 U.S. 18, 27 (1981) (stating that a " 'parent's interest in the accuracy and justice of the decision to terminate his or her parental status is * * * a commanding one' ").

{¶ 37} FCCS contends that "when the best interest factors are weighed together, without the incorrect sentence or findings; the evidence supports permanent custody being in the best interests of the child[]." (FCCS Brief at 25.) Thus, FCCS essentially asks this court to weigh the best interest factors anew without the trial court's incorrect findings. As an appellate court, however, we will not make factual findings in the first instance. *See* Ohio Constitution, Article IV, Section 3(B)(2) (providing that courts of appeals shall have such jurisdiction as may be provided by law to "review and affirm, modify, or reverse judgments or final orders" of trial courts within their district); *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 360 (1992); *Bank of Am., N.A. v. Seymour*, 10th Dist. No. 18AP-272, 2019-Ohio-2884, ¶ 31; *In re M.B.*, 9th Dist. No. 21760, 2004-Ohio-597, ¶ 9 (stating that, if an appellate court were "put in the situation of making the best interest finding in the first instance, our role as an appellate court [would] essentially [be] transformed into that of a trial court"); *In re D.K.*, 9th Dist. No. 26272, 2012-Ohio-2605, ¶ 11 (holding that the appellate court could not enter a new finding under R.C. 2151.414(B)(1), because doing so would "exceed our jurisdiction as an appellate court").

{¶ 38} Accordingly, as the trial court's findings that father had convictions for kidnapping, gross sexual imposition, escape, and failure to register as a sex offender were against the manifest weight of the evidence, and the court relied on these erroneous

findings in assessing D.R.'s best interests, the court's misstatements were prejudicial. We also note the trial court found D.R. "was adjudicated abused, neglected, and dependent," when the record demonstrates D.R. was only adjudicated abused. (Decision at 7.) The court also found I.K.—a person who had been convicted of gross sexual imposition against a minor, among other things—to be father's "roommate[]," when mother admitted she did not have any personal knowledge that I.K. lived with father and father denied that I.K. lived with him. (Decision at 12.)

{¶ 39} Upon a thorough consideration of the record, and given the seriousness of a trial court's decision to permanently terminate a parent's custody of their child, we find the factual errors in the trial court's judgment demonstrate that the judgment is not supported by clear and convincing evidence. As such, we sustain father's first assignment of error and sustain father's second assignment of error in part, thereby rendering moot the remaining contentions under father's second assignment of error regarding compliance with his case plan objectives. *See* App.R. 12(A)(1)(c). The judgment of the trial court is reversed and the case remanded for the court to properly analyze the R.C. 2151.414(D)(1) best interest factors in light of the evidence contained in the record.

## IV. Third Assignment of Error – Successor Trial Judge

{¶ 40} Father's third assignment of error asserts the proceedings in the trial court violated Civ.R. 63(A) because Judge Preisse failed to either certify that she had familiarized herself with the prior trial proceedings or expressly grant a new trial. As we have reversed the judgment of the trial court and remanded the case, our ruling on father's first and second assignments of error renders father's third assignment of error moot.

## V. Conclusion

{¶ 41} Having sustained father's first assignment of error and father's second assignment of error in part, rendering moot the remaining part of father's second assignment of error and father's third assignment of error, we reverse the judgment of Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch and remand to that court for proceedings consistent with law and this decision.

*Judgment reversed and cause remanded.*

BEATTY BLUNT, P.J., and LUPER SCHUSTER J., concur.

_____