[Cite as *In re A.M.*, 2025-Ohio-2993.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | | |
|---|---|---|---|
| In the matter of: | : | No. 24AP-657 | |
| [A.M., | : | (C.P.C. No. 23JU-702) | |
| | | (ACCELERATED CALENDAR) | |
| A.H., Appellant]. | : | | |

D E C I S I O N

Rendered on August 21, 2025

**On brief:** *Lucille A. Shane*, for Franklin County Children Services.

**On brief:** *John T. Ryerson*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

DINGUS, J.

{¶ 1} Appellant, A.H., mother of minor, A.M., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, placing A.M. in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

### A. From Missouri to Ohio, July 2020 – February 2022

{¶ 2} A.H. gave birth to A.M. in Clay County, Missouri in July 2020 when A.H. was 15 years old. A.H. had become pregnant with A.M. when she was living in a homeless shelter after running away from home. The father was reportedly deported to Mexico before A.M. was born.[1] Following A.M.'s birth, A.H. and A.M. lived with A.H.'s mother and

---

[1] A.M.'s paternity was never established, and the alleged father, who was purportedly around 20 years old at the time of A.M.'s birth, was not able to be reached throughout the pendency of A.M.'s custody proceedings. Although our discussion in this appeal focuses solely on the mother, we note that the trial court's permanent custody decision also addresses the alleged father and divests his parental rights to A.M.

stepfather in Kansas City, Missouri.  A.H. reported the family dynamic as being rife with domestic violence, alcoholism, and opioid abuse, causing her to run away from home again in late 2021 when she was 17 years old.  She was unable to find a shelter that would immediately house her and A.M. together, so she temporarily left A.M. in her mother's care while she attempted to secure placement for herself and A.M.  Her mother sent A.M. to live with a friend in Dayton, Ohio against A.H.'s wishes.  A.H. reported later finding out that the friend's four children were in local Children Services' custody due to the friend's abuse and drug use.

{¶ 3}    A.H. travelled to Ohio, retrieved A.M., and then stayed with her father and maternal grandmother in Westerville, Ohio for approximately two months around the beginning of 2022.  There too, the family dynamic was rife with domestic violence and substance abuse.  A.H. got a job at McDonald's and planned to save enough money to be able to move back to Kansas City with A.M.  However, after a conflict related to A.H.'s discomfort with her father being intoxicated while caring for A.M., the grandmother abruptly threw A.H. out of the house.  On February 26, 2022, after one of her first days of work, A.H. came home around 1:30 a.m. and found the doors locked and her belongings on the porch.  After an hour or so of police involvement, the grandmother briefly opened the door to hand over A.M.  Because A.H. was still a minor, both she and A.M. were taken into FCCS's custody.

**B. Agency involvement in Ohio, February 2022 – August 2022**

{¶ 4}    FCCS obtained a temporary order of custody for A.H. and A.M. in March 2022.  The FCCS complaint regarding A.M. alleged that he was a dependent minor.  After briefly living in separate placements, A.H. and A.M. were placed together in the same foster home.  FCCS began working with A.H. on a case plan, with the goal of A.M. returning to A.H.'s custody.  The plan for reunification required A.H. to become capable of meeting all of A.M.'s basic physical and emotional needs, and to attain an adequate level of financial, psychological, and home-life stability. A.H.'s personal objectives included enrolling in high school, finding employment, completing a mental health assessment, attending counseling, working with a parent mentor, and participating in independent living classes and youth transitional services.

{¶ 5}    A.H. was connected with various programs and met with multiple service providers starting in March 2022, and she was able to meet her goals of maintaining employment and completing high school.  However, she encountered problems with the remainder of her goals.  A.H.'s relationship with the foster parents deteriorated.  For instance, she accused the foster parents of being overly critical and failing to give her room to parent A.M., and the parents accused A.H. of being irresponsible with and neglectful of A.M.  Once A.H. turned 18 at the beginning of August 2022, the foster parents placed her belongings on the porch and told her to leave.  Because A.H. had not been eligible to apply for housing while she was still a minor, she was put in the position of having nowhere to stay while searching for her first apartment as an 18-year-old.

{¶ 6}    Workers at the Bridges Program advised A.H. to go to a women's shelter run by an organization that would help her find housing, after which point the Bridges Program would pay her rent and utilities, as long as she was either in school or working.  A.H. was frustrated that she essentially had to be homeless for a period to get services.  Instead, A.H. decided to buy a bus ticket and move to Laramie, Wyoming to live with a friend.

**C. Agency involvement in Wyoming and Ohio, August 2022 – July 2023**

{¶ 7}    A.M. was placed with new foster parents soon after A.H. left for Wyoming. A.H. and A.M. participated in video-conference visitations starting in September 2022. A.M. had some verbal delays but began to speak more around February 2023.  At that point, A.H. heard A.M. referring to the foster parents as mom and dad.  A.H. became upset and refused to participate in any further visits.

{¶ 8}    A.H. was able to find employment and housing in Wyoming, but she did not work on other case-plan goals, such as taking parenting classes and addressing mental health issues.  FCCS submitted a semiannual review with the trial court in February 2023, noting that A.H. had made insufficient progress toward addressing the concerns in her case plan.  On April 13, 2023, the trial court entered a temporary order of court custody and adjudicated A.M. as a dependent minor.

**D. Permanent custody proceedings, July 2023 – September 2024**

{¶ 9}    FCCS filed for permanent custody on July 24, 2023.  FCCS asserted that it could establish parental unsuitability under R.C. 2151.414(B)(1) for three independent reasons: (1) A.M. could not be placed with A.H. within a reasonable time or should not be

placed with A.H., R.C. 2151.414(B)(1)(a) and (E), (2) A.H. abandoned A.M., R.C. 2151.414(B)(1)(b), and (3) A.M. had been in FCCS's temporary custody for more than 12 out of a consecutive 22-month period, R.C. 2151.414(B)(1)(d). The trial court set a hearing date of August 25, 2023.

{¶ 10} In August 2023, A.H. was hospitalized for an intentional overdose of pain medication. A.H. reported being upset over a breakup and taking a double dose of hydrocodone, but she denied that she had overdosed or that she was suicidal. The August 2023 hearing on FCCS's motion for permanent custody was continued on the mother's motion to November 2023, and then on FCCS's motion to April 2024.

{¶ 11} Meanwhile, FCCS's semiannual reviews in August 2023 and February 2024 continued to conclude that A.H. had made insufficient progress toward addressing the concerns in her case plan. FCCS noted that A.H. had not pursued parenting or mental health services, and that she had not connected with a nearby counseling program that FCCS had identified as eligible for A.H.'s insurance.

{¶ 12} The permanent custody hearing was continued two more times, from April to July 2024, and then to September 23, 2024. Around mid-August 2024, A.H. attended an initial counseling session, and she resumed video-conference visitations with A.M. for the first time in a year and a half. A.M. did not remember A.H. and hid from her initially. FCCS's August 2024 semiannual review concluded that A.H. had made some progress toward addressing the concerns in her case plan.

{¶ 13} At the permanent custody hearing, the guardian ad litem ("GAL") testified that he believed A.H. had completed some of the goals in her case plan, but "[d]o I think it alleviated the reason for ongoing removal, no." (Sept. 23, 2024 Tr. at 174.) When the GAL attempted to assess A.M.'s wishes about his placement, A.M. identified his foster parents as his caregivers and the placement as his home where he would like to stay. When asked to think of anyone else who could be a caregiver, or if he recalled anyone who might have been one, A.M. could not identify anyone. A.H.'s caseworker testified that A.H. has recently been compliant with her case plan but recommended that FCCS receive permanent custody of A.M. because A.H. is a stranger to him, while A.M. is very bonded with his foster parents.

**E. Trial court's decision granting permanent custody**

{¶ 14} In October 2024, the trial court entered judgment granting FCCS's motion and committing A.M. to the permanent custody of FCCS for purposes of adoption. The court found that FCCS had made reasonable efforts to reunify A.M. with A.H., and that A.H. had legally abandoned A.M. The court additionally found that A.M. had been in the temporary custody of FCCS for 12 or more of the last 22 consecutive months, and that A.M. should not be placed with A.H. due to her lack of commitment toward, as well as her legal abandonment of, A.M. The trial court recognized the incredible hardships that A.H. had faced, and noted that A.H. had successfully addressed many of her case-plan objectives apart from maintaining a parent-child bond with A.M. However, the court was not permitted to determine A.M.'s best interests by looking at the unfairness of A.H.'s plight. The court concluded that permanent custody is in A.M.'s best interest, noting A.M.'s significant bond with his foster parents and their extended families, and his lack of any bond with A.H. or members of her family.

{¶ 15} A.H.'s timely appeal is now before this court.

## II. Assignment of Error

{¶ 16} A.H. assigns the following sole assignment of error for our review:

> The Court's Judgment and Decision Entry granting the permanent court commitment (PCC) of the minor child is against the manifest weight of the evidence, since Mother had substantially completed her reunification case plan requirements, and the child can and should be returned to Mother within a reasonable amount of time.

## III. Discussion

{¶ 17} "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974). Accordingly, the state may terminate the rights of a natural parent in certain circumstances when termination is in the child's best interest. *In re E.R.*, 2025-Ohio-1512, ¶ 10 (10th Dist.); *In re B.L.*, 2005-Ohio-1151, ¶ 21 (10th Dist.).

{¶ 18} To grant permanent custody of a child to a children services agency, a trial court must engage in a two-step analysis. *In re C.W.*, 2004-Ohio-6411, ¶ 9. In the trial court's analysis, it must determine by clear and convincing evidence that (1) any one of the factors set forth in R.C. 2151.414(B)(1) applies, and (2) that permanent custody is in the child's best interest. *Id.* "Clear and convincing evidence is that measure or degree of proof . . . which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. The clear-and-convincing standard involves a higher evidentiary burden than the standard of preponderance of the evidence, but not as high of a burden as the criminal standard of proof beyond a reasonable doubt. *Id.*

{¶ 19} On appeal, we will not reverse a trial court's permanent custody decision as being against the manifest weight of the evidence as long as the decision is "supported by some competent, credible evidence going to all the essential elements of the case." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21. " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *In re Z.C.*, 2023-Ohio-4703, ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984), quoting 5 Ohio Jur. 3d, *Appellate Review*, § 603, at 191-192 (1978). Deference to the finder of fact is particularly "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." (Emphasis omitted.) *Davis v. Flickinger*, 1997-Ohio-260, ¶ 15

{¶ 20} Regarding the first step of the trial court's analysis, there are five alternative factors in R.C. 2151.414(B)(1) that can satisfy the court's inquiry. The first factor applies when "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a). The first factor only applies when "[t]he child is not abandoned or orphaned," and has not been in temporary agency custody for more than 12 of 22 consecutive months. *Id.* The second factor applies if the "child is abandoned." R.C. 2151.414(B)(1)(b). A child must be

presumed abandoned when the child's parent fails to visit or maintain contact with the child for more than 90 days. R.C. 2151.011(C). The presumption of abandonment is unaffected even if the parent resumes contact with the child after the 90 days. *Id.* The third factor applies if the "child is orphaned, and there are no relatives of the child who are able to take permanent custody." R.C. 2151.414(B)(1)(c). The fourth factor applies when "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d). And the fifth factor applies when the child or another child in the parent's custody "has been adjudicated an abused, neglected, or dependent child on three separate occasions." R.C. 2151.414(B)(1)(e).

{¶ 21} Here, the trial court found that the first, second, and fourth factors all applied, although once the court concluded that one factor applied, it was not necessary for the court to make further findings regarding other factors under R.C. 2151.414(B)(1). *See In re N.W.*, 2008-Ohio-297, ¶ 9 (10th Dist.) ("R.C. 2151.414(B)(1) requires the existence of only one of the circumstances in R.C. 2151.414(B)(1)."). In fact, the first factor, R.C. 2151.414(B)(1)(a), has a mutually exclusive relationship with the second and fourth factors, because R.C. 2151.414(B)(1)(a) specifies that it does *not* apply if a child has been abandoned or has been in temporary agency custody for over 12 of 22 months. *See In re L.W.*, 2018-Ohio-2099, ¶ 13 (10th Dist.) ("R.C. 2151.414(B)(1)(a) only applies when R.C. 2151.414(B)(1)(b) through (d) do not apply."). Despite the contradictory nature of applying R.C. 2151.414(B)(1)(a) in addition to subdivisions (b) and (d), we have held that a trial court's application of such multiple factors is not prejudicial. *See In re N.W.* at ¶ 9 ("a trial court may cite more than one factor in the alternative"); *In re D.G.*, 2009-Ohio-7232, ¶ 39 (10th Dist.) (though the trial court unnecessarily addressed both R.C. 2151.414(B)(1)(a) and (d), "any error in doing so was not prejudicial").

{¶ 22} A.H. does not dispute that A.M. had been in the custody of FCCS for more than 12 of 22 consecutive months and that the factor in R.C. 2151.414(B)(1)(d) was therefore established. Accordingly, our review is limited to the second step of the trial court's analysis: whether granting permanent custody to FCCS was in A.M.'s best interest.

{¶ 23} To determine the best interest of a child, R.C. 2151.414(D)(1) directs the court to consider "all relevant factors," including those enumerated in R.C. 2151.414(D)(1)(a) through (e):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 24} The factors in R.C. 2151.414(E)(7) through (11) include (1) whether the parent was convicted of or pleaded guilty to certain criminal offenses, (2) whether the parent repeatedly withheld medical treatment or food from the child, (3) whether the parent put the child at a substantial risk of harm due to substance abuse, (4) whether the parent abandoned the child, and (5) whether the parent's parental rights were terminated regarding a sibling of the child.

{¶ 25} Here, the trial court considered all the factors relevant to A.M.'s best interests. It found, under R.C. 2151.414(D)(1)(a), that A.H. does not currently have a parent-child bond with A.M., whereas he has developed a significant bond with his foster parents and their extended families. The court determined, under R.C. 2151.414(D)(1)(b), that A.M. was too young to be able to directly express his wishes. It noted, under R.C. 2151.414(D)(1)(c), that A.M. has resided with his current foster parents for two years and could potentially be adopted. The court found, under R.C. 2151.414(D)(1)(d), that A.M. should not be returned to A.H.'s care, and that legally secure permanent placement could

only happen by granting permanent custody to FCCS and allowing A.M. to be placed for adoption. And regarding the factors in R.C. 2151.414(E)(7) through (11), the court noted that only one factor applied: that A.H. had legally abandoned A.M. The trial court additionally found relevant the GAL's recommendation that permanent custody was in A.M.'s best interest. It noted the GAL's view that "removing [A.M.] from what he perceives as his 'home' and . . . placing him into [A.H.]'s home would be akin to placing him in the home of a 'stranger' [and] would be extremely traumatic to him." (Oct. 10, 2024 Decision & Jgmt. Entry at 20.)

{¶ 26} In her sole assignment of error, A.H. argues that the trial court's overall decision was against the manifest weight of the evidence because it did not adequately consider the circumstances described in R.C. 2151.414(E)(1), which provides:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

A.H. asserts that because she complied with her case plan, she substantially remedied the conditions that led to A.M.'s initial removal from his home, and she should therefore regain custody of A.M. pursuant to R.C. 2151.414(E)(1).

{¶ 27} The factor described in R.C. 2151.414(E)(1) is merely one of the criteria that a trial court considers when determining, during the *first* step of its analysis, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents" under R.C. 2151.414(B)(1)(a). When a trial court determines the best interests of a child under the *second* step of its analysis, the relevant portion of the statute, R.C. 2151.414(D)(1)(e), "instructs the court to consider only whether any of the factors in R.C. 2151.414(E)(7) to (11) apply to the parents and child and does not incorporate the remaining factors contained in R.C. 2151.414(E)." *In re D.R.*, 2023-Ohio-

539, ¶ 28 (10th Dist.). Accordingly, the trial court was not required to consider R.C. 2151.414(E)(1) when determining whether permanent placement with FCCS was in A.M.'s best interest.

{¶ 28} Notwithstanding the fact that R.C. 2151.414(E)(1) is not a required part of a trial court's best-interest analysis, a trial court is not precluded from considering other relevant factors. *See In re D.J.*, 2025-Ohio-2573, ¶ 33 (10th Dist.) ("A juvenile court must consider all relevant factors, including the non-exhaustive list of R.C. 2151.414(D)(1) best-interest factors."). The substance of A.H.'s argument regarding case-plan compliance can be seen as relevant to whether, under R.C. 2151.414(D)(1)(d), legally secure permanent placement can be achieved without a grant of permanent custody to the agency. *See, e.g.*, *In re J.W.*, 2023-Ohio-1582, ¶ 50 (10th Dist.) (reviewing a parent's argument about case-plan compliance under R.C. 2151.414(D)(1)(d)); *In re G.T.*, 2023-Ohio-3649, ¶ 91-103 (10th Dist.) (same); *In re J.H.*, 2021-Ohio-807, ¶ 47-57 (10th Dist.) (same). Accordingly, we will consider A.H.'s argument to the extent that it is relevant to R.C. 2151.414(D)(1)(d).

{¶ 29} In support of her argument that she complied with her case plan, A.H. notes that she obtained employment and housing in Wyoming, that she began outpatient counselling and parenting classes in August 2024, and she has two friends who could keep A.M. overnight while she worked. The trial court acknowledged that "other than maintaining her visitation and thereby strengthening [A.M.]'s mother child bond with her, she has successfully [and] significantly addressed her case plan objectives." (Decision & Jgmt. Entry at 21.) However, the court also determined that A.H. had failed to address other aspects of her case plan. The court noted that A.H. did not begin to participate in mental health treatment or counseling until the 11th hour, leaving concerns that she will not continue to address her mental health issues. And the court noted that A.H.'s decisions to move to Wyoming and to cease contact with A.M. for 18 months hampered her ability to complete her case-plan objectives.

{¶ 30} Given the foregoing, the achieved goals that A.H. enumerates in her brief do not make up the entirety of her case plan. Moreover, a parent's completion of case plan requirements does not necessarily mean that the parent has remedied the conditions that caused the child to be removed from the home, nor does it necessarily mean that the parent is capable of providing a legally secure permanent placement for the child. *In re K.M.*,

2024-Ohio-2137, ¶ 54 (10th Dist.); *In re J.G.*, 2022-Ohio-4072, ¶ 38 (10th Dist.); *In re J.H.* at ¶ 57.

{¶ 31} In this case, the trial court determined that A.H.'s compliance with a portion of her case plan was outweighed by other factors indicating that A.M.'s placement with A.H. was not a realistic possibility. The court found that A.H. was unlikely to remedy her mental health concerns within the next year, and placing A.M. with A.H. would not be possible in the near future because A.H. was essentially a stranger to A.M.. By the time the permanent custody hearing took place, A.M. had been in FCCS custody for more than half of his life. The court's findings validly supported its conclusion, under R.C. 2151.414(D)(1)(d), that legally secure permanent placement for A.M. could not be achieved without granting permanent custody to FCCS. Upon review, the record supports the trial court's determination.

{¶ 32} Finally, we note that A.H. stresses in her brief that she had no control over the conditions that led to A.M.'s initial removal from her custody. It strikes this court as particularly unfair that one of the most impactful circumstances in A.H.'s case was the fact that she was a minor when FCCS became involved. Had A.H. been 18 years old in February 2022, FCCS may not have gotten involved at all, and A.H. may have been able to get different services that would have led to a more successful outcome. It also strikes the court as unfair that the statutory scheme in R.C. 2151.414 and related provisions impose the exact same standards on adults who have children, as well as those who have children when they are still children themselves. Asking a 17-year-old to create a stable life with housing, childcare, employment, health insurance, and mental health treatment is an extremely tall order. That being said, in this specific case it appears that the trial court and the caseworker took great pains to encourage the success of the reunification plan for A.H. and A.M. throughout the course of over two and a half years, and the trial court was particularly mindful of A.H.'s youth in its analysis of FCCS's motion for permanent custody. And, despite our reservations about the treatment of minor parents under the general statutory scheme, we recognize that the best-interests determination, under R.C. 2151.414(D)(1), must focus on the child, not the parent. *See In re B.B.H.*, 2015-Ohio-2347, ¶ 20 (10th Dist.).

{¶ 33} Viewing the record as a whole, we conclude that the trial court's determination of A.M.'s best interests, including whether legally secure permanent

placement was possible without granting permanent custody to FCCS, under R.C. 2151.414(D)(1)(d), was not against the manifest weight of the evidence. Accordingly, we reject A.H.'s sole assignment of error.

## IV. Disposition

{¶ 34} Having overruled A.H.'s sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT and EDELSTEIN, JJ., concur.

———————————