[Cite as *In re A.H.*, 2026-Ohio-719.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of A.H.,                    :

(J.H.,                                    :          No. 25AP-445
                                                   (C.P.C. No. 22JU-5856)
          Appellant).                     :
                                                   (REGULAR CALENDAR)
                                          :

_____

D E C I S I O N

Rendered on March 3, 2026

_____

**On brief:** *William T. Cramer*, for appellant.

**On brief:** *Silia L. Dory*, for appellee Franklin County
Children Services.

_____

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BOGGS, P.J.

{¶ 1}   Appellant, J.H., appeals the judgment of the Franklin County Court of
Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted appellee,
Franklin County Children Services ("FCCS"), permanent custody of J.H.'s minor child, A.H.
For the following reasons, we affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2}   J.H. gave birth to A.H., a baby girl, on March 15, 2022; A.H.'s father is
unknown.  FCCS received a referral in connection with A.H.'s birth due to concerns with
J.H.'s mental health.

{¶ 3}   On March 17, 2022, in case No. 22JU-2778, FCCS filed an initial complaint
with the trial court, alleging that two-day-old A.H. was a dependent child under R.C.
2151.04(B) and (C).  The complaint stated J.H. was under the guardianship of the Franklin
County Guardianship Service Board ("FCGSP") pursuant to an order of the Franklin County
Probate Court.  The complaint alleged that J.H. had arrived in Ohio a few months earlier,
after crossing the country from Washington state, and that she had no baby supplies and

no stable housing for herself or the baby.  According to the complaint, J.H. had her only prenatal medical visit on February 15, 2022, at which time she slurred words, had poor eye contact and a wondering gaze, had no true thought pattern, had no insight into her mental health conditions, and tested positive for THC.  The same day, J.H. was involuntarily committed to Ohio State Harding Hospital, where she was to return when she was medically discharged after A.H.'s birth.  The complaint stated that J.H. had been diagnosed with schizophrenia and post-traumatic stress disorder.

{¶ 4}  The trial court issued an emergency custody order on March 17, 2022, and a temporary order of custody ("TOC") the following day.  A.H. has remained in FCCS's custody since March 17, 2022.  She has been placed with her current foster parents, who have expressed the desire to adopt her, since October 2023.  A.H. has no special needs, and she has a strong bond with her foster parents and other children in the foster home.

{¶ 5}  During the early months of this case, from March to June 2022, J.H. attended weekly supervised visits with A.H.  During that timeframe, J.H. did not link with mental-health or alcohol-and-other-drug ("AOD") treatment providers to which FCCS referred her.  She did, however, complete a parenting assessment with the National Youth Advocate Program ("NYAP") and link with a parenting coach.  In June 2022, however, the parenting coach discharged J.H. due to lost contact.

{¶ 6}  FCCS likewise lost contact with J.H. from June 2022 until April 2023.  J.H. had no contact with A.H. during that period.

{¶ 7}  When the initial case was set to expire by operation of law, FCCS filed the instant case on June 7, 2022, restating its claims that A.H. was a dependent child under R.C. 2151.04(B) and (C).  The trial court issued a TOC the following day, and it appointed Roger M. Koeck as guardian ad litem ("GAL") for A.H.  On June 13, 2022, the trial court issued findings of fact and conclusions of law, in which it found that FCCS had made reasonable efforts to prevent the continued removal of A.H. by offering J.H. case-management services and parenting classes and by providing A.H. with foster-care placement.

{¶ 8}  The case came on for a hearing on August 24, 2022.  Although A.H. did not appear for the hearing, her attorney was present.  At the hearing, the trial court adjudicated A.H. a dependent minor, granted temporary court commitment ("TCC") to FCCS, and

approved and adopted a case plan. The case plan required J.H. to comply with mental-health services and recommendations, demonstrate the ability to meet A.H.'s basic needs, complete a parenting assessment and follow provider recommendations, complete an AOD assessment and follow provider recommendations, complete random drug screens and screen negative for all drugs, cooperate with FCCS and service providers, and sign consents for the release of information. The goal of the case plan was to reunify J.H. and A.H. The trial court extended TCC on March 13, 2023.

{¶ 9} Also in March 2023, FCGSB applied to the Franklin County Probate Court to terminate J.H.'s guardianship due to lack of contact and because FCGSB was not providing any ongoing services, but the probate court instead modified the guardianship so it extends only to emergency medical decisions.

{¶ 10} In April 2023, J.H. had obtained stable housing in Columbus and again made herself available to FCCS. She was living with a disabled adult male, Bill, who owned the house in which they lived. J.H.'s caseworker, Allison Hamilton, conducted monthly home visits from approximately May 2023 through July 2024. According to Hamilton, the home was appropriate and had a bed for A.H. Hamilton had no safety concerns with the home and no initial concerns about Bill. Once contact was reestablished between J.H. and FCCS, J.H. linked with NYAP for a mental-health assessment and counseling and with Aversys for drug screens. J.H. also completed a parenting course. Although J.H. claims she completed an AOD assessment, Hamilton had no record that an AOD assessment had been completed. J.H. was consistently engaged with mental-health services and consistently participating in drug screens through July 2024. J.H. also reestablished consistent, weekly supervised visits with A.H. During this timeframe, J.H. was undisputedly making progress on her case plan.

{¶ 11} FCCS filed its motion for permanent court commitment ("PCC") on June 28, 2023.

{¶ 12} In July 2024, FCCS began allowing J.H. unsupervised community visits with A.H., and approximately three of those visits occurred, giving rise to no initial concerns. Unsupervised visits ceased, however, as of July 22, 2024, when GAL Koeck requested that J.H. complete a parenting abilities psychological evaluation "before we go down the road too much more doing unsupervised visits," due to J.H.'s mental-health issues. (July 22,

2024 Tr. at 5.) FCCS noted, J.H. "has made significant case plan progress and it is possible that if given some more time reunification may be achievable." *Id*. at 4. FCCS was willing to facilitate a parenting abilities psychological evaluation. The trial court granted GAL Koeck's request for a parenting abilities psychological evaluation. It ordered FCCS to "immediately begin the process of linking [J.H.] with such an evaluation" and ordered J.H. to "cooperate fully." *Id*. at 10. Thereafter, unsupervised visits between J.H. and A.H. were suspended, in lieu of supervised visits at NYAP.

{¶ 13} Caseworker Hamilton testified that she initially referred J.H. to NYAP for the parenting abilities psychological evaluation but that J.H. declined when NYAP contacted her to schedule it. She stated that a second referral to NYAP was unsuccessful because, "due to attendance issues with [J.H.'s] counselor," they would not schedule her. (Nov. 18, 2024 Tr. at 47.) Hamilton stated she also provided J.H. with the name of Customized Behavioral Healthcare as a potential provider, but J.H. preferred to find her own provider.

{¶ 14} Trial on the PCC motion began November 18, 2024 and continued April 28 through 30, 2025. Over the course of the four-day trial, FCCS presented testimony from Hamilton; NYAP supervisor, Najiyyah Muqtasid-Denham; J.H.'s guardian, Marisa Philabaun; Koeck; and J.H., as on cross-examination. J.H. testified as the sole witness on her behalf. Hamilton, Muqtasid-Denham, and Koeck all recommended that the court grant FCCS's motion for PCC.

{¶ 15} As of the first day of trial in November 2024, J.H. had not completed a parenting abilities psychological evaluation. J.H. initially denied having received any referrals from Hamilton for the parenting abilities psychological evaluation, but she stated when she tried to schedule the evaluation with NYAP, "They said they could not do the assessment until they found a new psychologist." (Apr. 28, 2025 Tr. at 43.) Muqtasid-Denham acknowledged there was a period in which NYAP did not have a psychologist on staff, but she also stated that NYAP offered to put J.H. on a waitlist around October 2024, because it was in the process of hiring a new psychologist.

{¶ 16} When trial resumed in April 2025, the parenting abilities psychological evaluation still had not been completed. J.H. had begun receiving mental-health services from Community for New Directions toward the end of 2024, but Community for New Directions does not perform parenting abilities psychological evaluations. J.H. stated that,

sometime in or after November 2025, Hamilton advised her to call Netcare to schedule the evaluation, but Muqtasid-Denham acknowledged that Netcare "would not take a referral from us." *Id.* at 133. J.H. also stated that Hamilton directed her to "a place called Bridges" that does not offer parenting abilities psychological evaluations.[1] *Id.* at 46. Finally, she stated that Hamilton provided her with a phone number for Dr. George Serednesky, but the doctor was on vacation when she called, and she was not told when he would return.

{¶ 17} Hamilton expressed concerns arising out of J.H.'s visits with A.H. in October and November 2024, due to J.H. "escalating" during those visits. (Nov. 18, 2024 Tr. at 51.) She noted difficulty getting J.H. to clean up the room and leave at the end of the visitation period. She also described J.H. "getting very angry, raising her tone, being loud in the [a]gency." *Id.* at 53. She stated that, at a recent visit, J.H. became "very upset and irate" when GAL Koeck attended to observe. *Id.* at 51. The agency ultimately cancelled the visit so as not to upset A.H., and Hamilton stated it took about a half-hour, with both herself and Muqtasid-Denham, to deescalate the situation. According to Hamilton, J.H.'s behavior included "just saying random things, a lot of deflecting, crying, sweating, almost vomiting" and trying to video record the confrontation. *Id.* Muqtasid-Denham stated that J.H.'s hygiene, demeanor, and appearance started to decline in November 2024. She testified, J.H. "would come into the office and just kind of rant and talk in circles and then . . . there was a time that she showed up at the . . . office and they had to have her escorted out because of her behavior in the lobby." (Apr. 29, 2025 Tr. at 137.)

{¶ 18} As of the final days of trial in April 2025, J.H. was still living with Bill, but she was looking for an apartment of her own. J.H. initially testified that Bill's grandchildren were "in the process of moving in[,] hence me leaving." (Apr. 28, 2025 Tr. at 12.) But later, she equivocated, stating, "They may or may not move in. It's something they're still deciding. . . . They cannot move in until I move out." *Id.* at 14. J.H. had been looking for alternate housing for over a year, but she had not filed an application for any apartment. J.H. testified that she was working part-time, approximately 15 to 25 hours per week, at Standard Hall, but she also stated she would likely need to get another job or a roommate

---

[1] Muqtasid-Denham testified that the referral was to "Bridgewright," which was unable to link with J.H. (Apr. 29, 2025 Tr. at 133-134.)

to make the required deposit on an apartment. J.H. did not provide FCCS with any paystubs or work schedules as proof of her employment.

{¶ 19} Following the conclusion of trial testimony, J.H.'s GAL, Kelley Boller, recommended that the court grant the motion for PCC. Boller acknowledged J.H.'s love for her daughter but stated it would not be in the best interest of J.H. to regain custody of A.H., due to her ongoing mental-health issues. She stated, "I very much worry about her ability to parent daily without getting into further legal trouble." (Apr. 30, 2025 Tr. at 55.) On the other hand, Boller stated it would be in J.H.'s interest to have the ability to maintain a relationship with A.H. despite an award of PCC.

{¶ 20} The trial court granted FCCS's motion for PCC on May 9, 2025. In assessing witness credibility, the trial court found, "Credibility is an issue with [J.H.], likely due to her struggles with mental health." (May 9, 2025 Decision & Jgmt. Entry at 2.) The trial court noted inconsistent stories of how J.H. ended up in Ohio and noted that its observations of J.H. at the time of trial mirrored the descriptions of her behavior that led to the appointment of a guardian over J.H. around the time of A.H.'s birth: J.H.'s "thought process was disorganized, illogical and loose associations. Her memory was impaired with episodes of confabulation and her concentration and comprehension were impaired. As such she struggled to process information regarding her current situation, necessary treatments and had no understanding of the severity of her symptoms and the impact on her ability to make sound decisions." *Id.* at 5. As to J.H.'s demeanor during trial, the court stated, "she presented with poor eye contact, wondering gaze and no true thought pattern- even when being directed and led by her own counsel for testimony. Throughout the process she could become confused and reluctant or unable to be re-directed to the point." *Id.* at 8.

{¶ 21} The trial court again found that FCCS had "made reasonable efforts to prevent or eliminate the need for removal of [A.H.] from her own home and to return her to [J.H.'s] custody and care or to find a least restrictive placement." *Id.* at 3. It specifically noted Hamilton had made reasonable efforts to assist J.H. in understanding her case-plan objectives and timelines, provided referrals for services, and attempted to assist J.H. in linking with those services. The trial court also found that FCCS made reasonable efforts to link J.H. for a parenting abilities psychological evaluation but that J.H.'s "refusal or

failure to timely follow through" resulted in such an evaluation not being completed before the conclusion of the trial. *Id.* at 8. The trial court did "not find [J.H.] credible as to the extent of her efforts and ability to link for this evaluation." *Id.*

{¶ 22} As to the statutory requirements for an award of PCC, the trial court found that FCCS presented clear and convincing evidence to satisfy R.C. 2151.414(B)(1), inasmuch as A.H. had been in temporary custody of FCCS for 12 or more months of a consecutive 22-month period prior to the filing of the motion for PCC and that A.H. had been abandoned. Under R.C. 2151.414(B)(2), the trial court found A.H. cannot be placed with a parent within a reasonable time or should not be placed with the child's parent and that an award of permanent custody is in A.H.'s best interest. In making its best-interest determination, the trial court specifically considered the factors listed in R.C. 2151.414(E).

{¶ 23} J.H. filed a timely notice of appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 24} J.H. raises the following assignments of error for this court's review:

> [1.] The agency failed to make reasonable and diligent efforts to reunify the family because it provided ineffective referrals for a parenting ability psychological assessment that was belatedly imposed as a roadblock to unification.
>
> [2.] The weight of the evidence does not support a finding that permanent custody was in the best interest of the child because the [] appellant had completed large portions of the case plan, built a bond with the child, and was working toward reunification.

(Appellant's Brief at ii.)

## III. DISCUSSION

{¶ 25} Before turning to J.H.'s specific assignments of error, we first briefly review the requirements of R.C. 2151.414, which governs the termination of parental rights in Ohio. *See In re K.H.*, 2008-Ohio-4825, ¶ 42.

### A. R.C. 2151.414

{¶ 26} Parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. *In re H.D.*, 2014-Ohio-228, ¶ 10 (10th Dist.), citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Nevertheless, parental rights are subject to the child's ultimate welfare. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). The state

may terminate parental rights under certain circumstances, when termination is in the best interest of the child. *In re A.P.*, 2023-Ohio-2463, ¶ 9 (10th Dist.), citing *H.D.* at ¶ 10.

{¶ 27} "Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, 'by clear and convincing evidence, that it is in the best interest of the child' to do so and that one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies." *In re Z.C.*, 2023-Ohio-4703, ¶ 7. " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 28} The determination whether to grant permanent custody of a child to a public children services agency involves a two-step process. *In re K.L.*, 2013-Ohio-3499, ¶ 18 (10th Dist.), citing *In re R.G.*, 2013-Ohio-914, ¶ 6 (10th Dist.). The juvenile court must first determine whether any factor set out in R.C. 2151.414(B)(1) applies. As applicable here, those factors include, "[t]he child is abandoned," R.C. 2151.414(B)(1)(b), and "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period," R.C. 2151.414(B)(1)(d). If the juvenile court concludes that one of the R.C. 2151.414(B)(1) factors applies, it must then determine whether a grant of permanent custody is in the child's best interest.

{¶ 29} J.H. does not dispute that FCCS satisfied its burden of demonstrating satisfaction of R.C. 2151.414(B)(1). More specifically, she does not dispute that she abandoned A.H. by failing to have contact with her for at least 90 days, nor does she dispute that A.H. has been in FCCS custody for 12 or more months of a consecutive 22-month period. As discussed below, in relation to J.H.'s second assignment of error, J.H.'s argument on appeal is directed at FCCS's efforts to demonstrate that an award of permanent custody is in A.H.'s best interest.

## B. First Assignment of Error

{¶ 30} In her first assignment of error, J.H. argues that FCCS failed to make reasonable and diligent efforts to reunify her with A.H., because it provided ineffective

referrals for the parenting abilities psychological evaluation the trial court ordered in July 2024. In support of this assignment of error, J.H. relies on R.C. 2151.419, which states, in part:

> **(A)(1)** Except as provided in division (A)(2) of this section, *at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code* at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. . . . In determining whether reasonable efforts were made, the child's health and safety shall be paramount.

(Emphasis added.)

{¶ 31} The statutory sections listed in R.C. 2151.419(A)(1) involve "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.*, 2007-Ohio-1104, ¶ 41. "The statute makes no reference to a hearing on a motion for permanent custody. Therefore, '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.' " *Id.*, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.).

{¶ 32} As the Supreme Court of Ohio stated in *In re C.F.*, however, the inapplicability of R.C. 2151.419(A) to motions for permanent custody does not relieve the agency of the duty to make reasonable efforts toward family reunification. "[E]xcept for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶ 33} Here, the trial court had previously and repeatedly determined that FCCS had made reasonable efforts to eliminate the need for the continued removal of A.H. from J.H.'s custody. It made those findings in June 2022, when it issued a TOC; in August 2022, when it granted TCC to FCCS; and in March 2023, when it extended TCC. [PDF 26, 37, 66, 114.] J.H. did not object to any of those findings. To the extent a finding on the issue of reasonable efforts is required before a juvenile court may order PCC, a trial court's finding made during an earlier portion of the proceedings satisfies that requirement. *See In re K.L.*, 2013-Ohio-3499, ¶ 40 (10th Dist.); *In re K.M.*, 2015-Ohio-4682, ¶ 47 (10th Dist.). Here, prior to the hearing on the motion for permanent custody, FCCS established and the trial court found that FCCS had made reasonable efforts to eliminate the need for the continued removal of A.H. from J.H.'s custody.

{¶ 34} Furthermore, the trial court again specifically found in its decision and judgment entry granting permanent custody to FCCS that FCCS had made reasonable efforts to eliminate the need for continued removal of A.H., to return A.H. to her mother's custody, and to find a least restrictive placement. J.H.'s argument that FCCS's actions vis-à-vis referring her to a provider for the parenting abilities psychological evaluation demonstrate that FCCS did not make reasonable efforts to eliminate the need for removal is not well-taken. The trial court found that FCCS made reasonable efforts to refer and link J.H. with a provider by making at least three separate referrals between July 2024 and April 2025 and that J.H.'s testimony as to the extent of her efforts and ability to link with a provider for the evaluation lacked credibility. The trial court stated that J.H.'s refusal or failure to follow through, not the lack of effort on FCCS's part, resulted in her not completing the evaluation before the conclusion of trial, and the record fully supports the trial court's determination on that issue.

{¶ 35} Having concluded that FCCS demonstrated it made reasonable efforts to assist J.H. with reunification, including particularly with respect to linking her with a provider for the court-ordered parenting abilities psychological evaluation, we overrule J.H.'s first assignment of error.

## C. Second Assignment of Error

{¶ 36} In her second assignment of error, J.H. maintains that the trial court's judgment granting FCCS's motion for permanent custody of A.H. is against the manifest

weight of the evidence. As stated above, J.H. does not dispute that FCCS satisfied its burden of demonstrating satisfaction of R.C. 2151.414(B)(1) and, instead, bases her manifest-weight argument solely on the trial court's finding that an award of permanent custody was in the best interest of A.H.

{¶ 37} We will not reverse a trial court's permanent-custody decision as being against the manifest weight of the evidence "as long as the decision is 'supported by some competent, credible evidence going to all the essential elements of the case.' " *In re A.M.*, 2025-Ohio-2993, ¶ 19 (10th Dist.), quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus; *see also In re J.M.*, 2015-Ohio-3988, ¶ 7 (10th Dist.). "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.*, 2023-Ohio-4703, at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. Applying the manifest-weight standard, we " ' "must make every reasonable presumption in favor of the judgment and the trial court's findings of fact." ' " *K.M.*, 2015-Ohio-4682, at ¶ 13 (10th Dist.), quoting *In re J.T.*, 2012-Ohio-2818, ¶ 8 (10th Dist.), quoting *In re P.G.*, 2012-Ohio-469, ¶ 37 (10th Dist.).

{¶ 38} R.C. 2151.414(D)(1) offers guidance for evaluating the best interest of the child and requires the court to "consider all relevant factors, including but not limited to, the following:"

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

The factors set out in R.C. 2151.414(E)(7) through (11) include: (1) whether the parent has been convicted of or pled guilty to various crimes, (2) whether the parent has repeatedly withheld medical treatment or food from the child, (3) whether the parent has repeatedly placed the child at a substantial risk of harm due to alcohol or drug abuse and has repeatedly rejected or refused to participate in alcohol or drug treatment, (4) whether the parent has abandoned the child, and (5) whether the parent has had his or her parental rights involuntarily terminated with respect to a sibling of the child.

{¶ 39} The trial court carefully considered each of the factors set out in R.C. 2151.414(D)(1) and (E)(7) through (11) in its decision and judgment entry. The trial court recognized A.H.'s strong bond with her foster family, but also recognized the developing relationship between A.H. and J.H. *See* R.C. 2151.414(D)(1). Although there was evidence of positive visitation interactions between J.H. and A.H. and that A.H.'s comfort with J.H. had increased with time, there was also testimony that A.H. frequently played by herself during visits and that J.H. seemed more interested in talking with other adults. GAL Koeck testified that he had observed J.H. not paying close enough attention to A.H. during a recent visit, to the point he worried for A.H.'s safety. There was also testimony that J.H.'s behavior at recent visits had upset A.H.

{¶ 40} As to R.C. 2151.414(D)(1)(b), the trial court noted the GAL's report that A.H., who is mature and extremely verbal for her age, has expressed the desire to remain with the foster family. But the court also recognized the GAL's acknowledgement that, at three years old, A.H. could not fully understand the permanent nature of the decisions to be made in this case.

{¶ 41} The trial court found—and J.H. did not dispute—that A.H. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. It further found that A.H. had lived with her current foster family, with whom she was bonded and thriving, for approximately 15 months. *See* R.C. 2151.414(D)(1)(c). The trial court

found that A.H. needs a legally secure, permanent placement, which J.H. could not provide currently or in the reasonably foreseeable future.  *See* R.C. 2151.414(D)(1)(d).

{¶ 42}  Under R.C. 2151.414(E)(7) through (11), the trial court found relevant only that J.H. had abandoned A.H.—a finding that J.H. did not dispute, based on the absence of contact between herself and A.H. from July 2022 until April 2023, a period of greater than 90 days.  Finally, the trial court considered the GAL's recommendation that a grant of PCC to FCCS was in A.H.'s best interest.  Based on the evidence discussed above, we conclude that competent, credible evidence supports each of the trial court's findings under R.C. 2151.414(D)(1).

{¶ 43}  Although J.H. broadly argues that the factors in R.C. 2151.414(D)(1) weigh against an award of permanent custody to FCCS, she does not specifically dispute any of the trial court's findings under R.C. 2151.414(D)(1).  Instead, she focuses her argument under her second assignment of error primarily on evidence of her efforts to comply with her case plan, which the trial court appropriately considered as part of its best-interest analysis.  J.H. states that she had appropriate housing for over a year, maintained employment, was aware of available public resources, utilized a parenting mentor to complete a parenting class, engaged in mental-health counseling, consistently visited and demonstrated her ability to interact positively with A.H, and demonstrated a familial bond with A.H.  She further argues that "there was never any real concern" regarding the use of "illicit drugs, just occasional marijuana use."  (Appellant's Brief at 38.)  Arguments regarding case-plan compliance may be relevant under R.C. 2151.414(D)(1)(d) to whether a legally secure permanent placement can be achieved without a grant of permanent custody to the agency.  *A.M.*, 2025-Ohio-2993, at ¶ 28 (10th Dist.), citing, e.g., *In re J.W.*, 2023-Ohio-1582, ¶ 50 (10th Dist.), *In re G.T.*, 2023-Ohio-3649, ¶ 91-103 (10th Dist.), and *In re J.H.*, 2021-Ohio-807, ¶ 47-57 (10th Dist.).

{¶ 44}  J.H. states she had maintained appropriate housing for over a year.  While J.H.'s housing was consistent from the time she reconnected with FCCS in April 2023 through trial, the trial court found that J.H.'s "housing is . . . now of concern due to her testimony that Bill's daughter and grandchildren are planning on moving in with him," which would require her to move.  (May 9, 2025 Decision & Jgmt. Entry at 9.)  J.H. also mentioned at trial the possibility of Bill selling the house.  Further, J.H. indicated it was her

intention to find her own housing, but she testified that she had been searching for appropriate housing for over a year but had not submitted any formal applications for an apartment. As to her claim that she has maintained employment, the trial court noted that J.H. had failed to provide any documentation verifying her employment or her earnings from her claimed part-time job at Standard Hall. J.H. also testified that she was "leaving that job" and looking for another, because she was not getting as many hours as she anticipated. (Apr. 30, 2025 Tr. at 19.)

{¶ 45} While J.H. claims she is aware of public resources, such as social security benefits, the evidence established that she had not applied for social security benefits. At the beginning of this case, FCGSP tried to assist J.H. in applying for social security benefits, which would have required J.H. to have a primary care physician, but J.H. declined to link with the physician to which FCGSP referred her. J.H. never informed FCGSP she had established a relationship with another primary care physician to support her application.

{¶ 46} The trial court acknowledged J.H.'s successful completion of a NYAP parenting program, but when asked at trial, J.H. could not identify "the most important things [she] learned" from that program. (Apr. 29, 2025 Tr. at 78.) Instead, she responded by describing her relationship with the parenting coach and the location where she met the parenting coach. And while J.H. states that she was engaged in mental-health counseling, the trial court noted reports that J.H. was no longer consistent with her mental-health appointments and had been discharged from treatment for failure to comply.

{¶ 47} J.H. undoubtedly made progress on her case plan during this case, especially prior to October 2024. Hamilton acknowledged that progress in her trial testimony, and FCCS acknowledged it when it agreed to a continuance in July 2024 to allow J.H. additional time to work toward reunification. Even so, "a parent's completion of case plan requirements does not necessarily mean that the parent has remedied the conditions that caused the child to be removed from the home, nor does it necessarily mean that the parent is capable of providing a legally secure permanent placement for the child." *A.M.*, 2025-Ohio-2993, at ¶ 30 (10th Dist.). A parent's compliance with the requirements of a case plan is but one of many factors the court may find relevant and must consider in rendering its judgment. *In re Brooks*, 2004-Ohio-3887, ¶ 63 (10th Dist.).

{¶ 48} The trial court determined that the evidence of J.H.'s progress on her case plan was outweighed by evidence that, due in large part to her mental-health diagnoses, J.H. cannot provide A.H. with a safe, permanent home currently or in the reasonably foreseeable future. Despite J.H.'s progress on her case plan through October 2024, the trial court heard testimony that J.H. had been "escalating" during more recent visits, which upset A.H. The court found credible a report that J.H. was no longer consistently attending mental-health appointments and that she had been discharged from treatment for failure to comply. The trial court also found significant J.H.'s failure to link with a provider to complete the court ordered parenting abilities psychological evaluation. It stated that, without such an evaluation, J.H.'s "failure or likely inability to sustain substantial compliance with the case plan objectives" was dispositive. (Decision & Jgmt. Entry at 8.) In weighing the evidence, the trial court relied on "strong evidence" that J.H. "will not be able to successfully address her mental health struggles in the reasonable future." *Id.* The trial court's findings support its conclusion that legally secure permanent placement for A.H. could not be achieved without granting permanent custody to FCCS.

{¶ 49} The evidence addressed above demonstrates that clear and convincing evidence supports the trial court's findings under the statutory best-interest factors, as well as the trial court's ultimate decision that an award of permanent custody was in the best interest of A.H. Viewing the record as a whole, we cannot conclude that the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Accordingly, we conclude that the trial court's determination of A.H.'s best interests was not against the manifest weight of the evidence, and we overrule J.H.'s second assignment of error.

## IV. CONCLUSION

{¶ 50} Having overruled J.H.'s two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN and MENTEL, JJ., concur.

———————————